IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| COLLIE M. TRANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-10-555-C |
| | ) | |
| (1) STATE OF OKLAHOMA; | ) | |
| (2) BOARD OF MEDICOLEGAL | ) | |
| INVESTIGATIONS; | ) | |
| (3) OFFICE OF THE CHIEF | ) | |
| MEDICAL EXAMINER; | ) | |
| (4) DEWAYNE ANDREWS, in his | ) | |
| individual and official capacities; | ) | |
| (5) DOUGLAS STEWART, in his | ) | |
| individual and official capacities; | ) | |
| (6) ROCKY MCELVANY, in his | ) | |
| individual and official capacities; | ) | |
| (7) C. MICHAEL OGLE, in his | ) | |
| individual and official capacities; | ) | |
| (8) CHARLES CURTIS, in his | ) | |
| individual and official capacities; | ) | |
| (9) KARLIS SLOKA, in his | ) | |
| individual and official capacities; | ) | |
| (10) CHRIS FERGUSON, in his | ) | |
| individual and official capacities; | ) | |
| (11) SHANDA MCKENNY, in her | ) | |
| individual and official capacities; | ) | |
| (12) CHEROKEE BALLARD, in her | ) | |
| individual and official capacities; | ) | |
| (13) SANDRA BALZER, in her | ) | |
| individual and official capacities; | ) | |
| (14) TOM JORDAN, in his | ) | |
| individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

## I. INTRODUCTION

Plaintiff brought the present suit seeking declaratory and monetary relief against fourteen Defendants, including the State of Oklahoma and members of the Board of Medicolegal Investigations in their individual and official capacities, under nineteen various causes of actions sounding in federal and state law. Plaintiff originally filed suit in state court, and thereafter Defendants removed to this Court asserting jurisdiction pursuant to 28 U.S.C. § 1331. Defendants now move this Court to dismiss the entire action for failure to state a claim on which relief can be granted. For reasons more fully set forth herein, this Court now partially grants Defendants' Motions to Dismiss as to Plaintiff's fourteenth, fifteenth, and sixteenth causes of actions, and remands the remaining state-law actions to state district court.

## II. BACKGROUND

In May 2009, Defendant Board of Medicolegal Investigations (Board) appointed Plaintiff Collie M. Trant as the Chief Medical Examiner (CME) of the State of Oklahoma. (Pl.'s Am. Compl., Dkt. No. 38, at 9.) In his role as CME, Plaintiff was responsible for supervising and directing the Office of the Chief Medical Examiner (OCME), as well as maintaining the day-to-day operation of the office. (Id. at 10.) After his appointment, Plaintiff alleges he discovered several problems within the OCME, including that the OCME was underfunded, in risk of losing its accreditation, and being investigated for sexual-harassment claims and improper employee overtime claims. (Id.) Specifically, a

former OCME investigator, Kevin Rowland,[1] was investigated for and, in July 2009, was indicted by a multi-county grand jury for sexual harassment and sexual battery. (Id. at 11.)

Before this indictment, Plaintiff alleges he discovered that the sexual harassment claims investigator, Jill Kinney, was improperly encouraging employees to make false overtime and sexual harassment claims. (Id.) Plaintiff asserts Defendant Ballard, acting as the Executive Administrator, informed him to "not put anything in writing about this potential misconduct." (Id.) Plaintiff also alleges that a media "verbal war" about the indictment ensued between his attorney and the Attorney General's Office. (Id.) Plaintiff's counsel also represented the former investigator, Mr. Rowland, during his indictment and subsequent trial for sexual harassment and battery—Mr. Rowland was subsequently acquitted of those charges. (Id. at 14.) Along with this indictment, the multi-county grand jury also released an interim report expressing its negative opinions as to the OCME's operation. (Id. at 11.) In response to this negative attention, Plaintiff stated to reporters that he "'plan[ned] to counteract the [negative] image by starting . . .[ ]to publicly address, via media interviews, the misstatements by politicians, the Multi-County Grand Jury and anyone else who has criticized the agency in recent years without having a clue as to what they are talking about.'" (Id. at 12) (first alteration in original).

---

[1] In his Amended Complaint, Plaintiff inconsistently spells Mr. Rowland's name. (Pl.'s Am. Compl., Dkt. No. 38, at 15, 18, 21, 22) (spelling the former investigator's name as "Kevin Rollin," "Kevin Roland," and "Kevin Rowland"). This Court assumes Plaintiff is referring to the same person and that, for this Court's purposes, this discrepancy is immaterial.

On December 6, 2009, a Tulsa office employee gave Plaintiff e-mails regarding Jill Kinney's alleged impropriety and the circumstances surrounding Kevin Rowland's indictment, which Plaintiff subsequently passed on to Defendant Ballard.  (Id. at 14-15.) During this time, Plaintiff hired—based on the Board's advisement—Defendant Tom Jordan as the Chief Administrative Officer of the OCME.  (Id. at 15.)  After a dispute with Defendant Jordan about the behavior of the Tulsa office employees, Plaintiff arranged a meeting between the two.  However, before this meeting took place, Defendant Andrews allegedly summoned Plaintiff to a meeting, which Plaintiff asserts violated the Oklahoma Open Meeting Act (OMA), with three Board members and Defendant Jordan.  (Id. at 15, 17.) The following day, Plaintiff sent Defendant Andrews an e-mail expressing his concern about the prior day's meeting and stating that the Attorney General's Office had informed him to remain quiet regarding this information and had "threatened to 'finish' the OCME."  (Id. at 18.) Defendant Andrews then forwarded this e-mail to Defendant Ferguson with instructions to inform the Board about the e-mail.  (Id. at 19.)

The following day, the Board notified Plaintiff that an emergency meeting was to be held on February 1, 2010.  (Id.)  Again, Plaintiff alleges this meeting violated the required procedures set forth in the OMA.  (Id.)  At this meeting, the Board voted to go into executive session to discuss Plaintiff's employment as CME.  (Id.)  Other than a twenty-minute opportunity to present his "case," Plaintiff was excluded from this executive session.  (Id. at 19-20.)  Plaintiff asserts that he was unaware of the content of the meeting's discussion, but

that he presented, during that twenty-minute period, the information he had stated in his e-mails regarding the agency's employee's improprieties and the indictment.  (Id. at 20.)

Plaintiff alleges that during this executive session, Defendant Jordan informed the Board that Plaintiff was inept, a liar, and lacking integrity.  (Id.)  At the conclusion of this Board meeting, after returning to open session to vote, the Board placed Plaintiff on administrative leave.  (Id.)  Plaintiff contends that by excluding him from this executive session Defendants again violated the OMA.  (Id. at 20-21.)  Plaintiff asserts this action was taken in retaliation for his report of alleged wrongdoing within the Tulsa office and the information surrounding the indictment of Kevin Rowland.  (Id. at 21.)

Two days after Plaintiff was placed on administrative leave, the Board announced that a scheduled Board meeting would be held on February 5, 2010.  (Id. at 24.)  That same day, Plaintiff's attorney informed the media that Plaintiff was terminated for "complain[ing] to the Attorney General about the problems with the investigat[ion] into former chief investigator Kevin Rowland."  (Id. at 25.)  The following day, the local newspaper ran a story claiming Plaintiff planned to contact the Federal Bureau of Investigation (FBI) about irregularities Plaintiff discovered while acting as CME.  (Id.)  On February 5, 2010, the Board voted to terminate Plaintiff while in an open meeting.  (Id.)  On February 6, 2010, Defendant Jordan was quoted in the local newspaper as saying:  "'I don't think the man's [Plaintiff] competent to run the agency.  I'm not sure he's mentally stable.  And he has fabricated[ ]. . .[ ]or embel[l]ished many of [th]e statements he has made both[ ]. . .[ ]in executive sessions of the board meetings and to the media.'"  (Id. at 26.)  Defendants Ballard

and Jordan also allegedly informed the media that Plaintiff had unlawfully taken CME property and mismanaged the office.  (Id. at 27.)

## III. STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must set forth factual allegations sufficient to "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009).  A plaintiff need not detail factual allegations in the complaint, but must provide the grounds of entitlement to relief, which entails more than labels and conclusions—"a formulaic recitation of the elements of a cause of action will not do . . . ." Twombly, 550 U.S. at 555.  When considering a motion to dismiss, courts look to the complaint and those documents attached to or referred to in the complaint, accept as true all allegations contained in the complaint, and draw all reasonable inferences from the pleading in favor of the pleader.  Pace v. Swerdlow, 519 F.3d 1067, 1072 (10th Cir. 2008); Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007).  A court is not bound to accept as true a plaintiff's legal assertions.  Iqbal, ___ U.S. at ___, 129 S. Ct. at 1949-50.

## IV.  DISCUSSION

### A. *Absolute Immunity*

Defendant Balzer asserts absolute immunity, in addition to qualified immunity, in her role as Assistant Attorney General in counseling the Board.  "[S]ome officials perform 'special functions' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability."

6

Buckley v. Fitzsimmons, 509 U.S. 259, 268-69 (1993). Prosecutors are absolutely immune from civil liability for activities that are "intimately associated with the judicial . . . process," but are not entitled to absolute immunity for actions classified as administrative or investigative. Imbler v. Pachtman, 424 U.S. 409, 430 (1976); Harlow v. Fitzgerald, 457 U.S. 800, 811 n.16 (1982). "The more distant a function is from the judicial process, the less likely absolute immunity will attach." Snell v. Tunnell, 920 F.2d 673, 687 (10th Cir. 1990). The Supreme Court has outlined a functional approach to determining absolute immunity that examines the nature of the function performed, rather than the identity of the actor performing it. Kalina v. Fletcher, 522 U.S. 118, 127 (1997).

Whether Defendant Balzer's conduct is properly classified as an act undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in her role as an advocate for the state, or in an administrative or investigatory role presently need not be decided as this Court finds that Defendants are entitled to qualified immunity.

### B. Qualified Immunity

Plaintiff's only federal claims are those under 42 U.S.C. § 1983 asserting violations of Plaintiff's First and Fourteenth Amendment rights against Defendants in their individual capacities, and only those claims will herein be addressed. Governmental officials performing discretionary functions are entitled to qualified immunity against civil suit in their individual capacities to ensure against subjecting those "'officials either to the costs of trial or to the burdens of broad-reaching discovery.'" Crawford-El v. Britton, 523 U.S. 574, 588 (1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982)). The "driving

force" behind the creation of qualified immunity doctrine was to ensure the resolution of insubstantial claims against government officials before discovery. Pearson v. Callahan, ___ U.S. ___, ___, 129 S. Ct. 808, 815 (2009) ("Accordingly, 'we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991))). "'When a defendant pleads qualified immunity, the plaintiff has the heavy burden of establishing: (1) that the defendant's actions violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions.'" Scott v. Hern, 216 F.3d 897, 910 (10th Cir. 2000) (quoting Greene v. Barrett, 174 F.3d 1136, 1142 (10th Cir. 1999)). A constitutional right is clearly established when, at the time of the alleged violation, "'[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right.'" Gann v. Cline, 519 F.3d 1090, 1092 (10th Cir. 2008) (first alteration in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

It is not necessary for a plaintiff to find a case with an identical factual situation, but that plaintiff must show legal authority that makes it "apparent" that "in the light of pre-existing law" a reasonable official would have known that the conduct in question violated the constitutional right at issue. Moore v. Guthrie, 438 F.3d 1036, 1042 (10th Cir. 2006). District courts have discretion in "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

Pearson, ___ U.S. at ___, 129 S. Ct. at 817-18.  The failure of either requirement is sufficient to find an official is entitled to qualified immunity.

For the reasons that follow, Plaintiff's allegations fail to satisfy either prong.  In his Amended Complaint, Plaintiff neither sufficiently alleges that Defendants violated his constitutional rights, nor demonstrates that his federal constitutional claims were so clearly established as to overcome the "hurdle" of qualified immunity.  Thus, Defendants are entitled to qualified immunity in their individual capacities against Plaintiff's § 1983 claims.  Because this determination rests on the analysis of the clarity of the underlying constitutional claims, each alleged constitutional violation must be more fully discussed.

### 1.  First Amendment

Plaintiff asserts that Defendants violated his freedom of speech when they "retaliated" against him for speaking to the media about the allegedly improper indictment of a prior agency investigator and bad behavior within the agency.  Plaintiff asserts the First Amendment protects the following speech:  Plaintiff's statements to the Board about the impropriety of the Tulsa employees and the indictment; Plaintiff's statements to the media regarding the negative public reaction to the multi-county grand jury's indictment and interim report about the OCME; and Plaintiff's or his attorney's report to the media that he intended to take his "findings" to the FBI.  As to the last event, Plaintiff's Amended Complaint leaves doubt as to who communicated this information to whom.[2]  In Plaintiff's

_____

[2]  In Plaintiff's Amended Complaint, the description given of the events surrounding this newspaper article state:  "[T]he local newspaper ran a story under the headline[:]  'Medical Examiner Plans to Give Evidence to FBI[.]'"  With the quoted story text stating:  "'Attorneys for

Amended Complaint, all allegedly protected speech involves communications made by Plaintiff, or his attorney, to Plaintiff's insubordinates, the Board, and the media regarding the indictment of the former investigator and the improper conduct of the OCME's employees.

To determine whether Plaintiff's speech is protected, the pivotal issue is whether his statements were made pursuant to his role as Chief Medical Examiner or as a concerned citizen. The Tenth Circuit uses the Garcetti-Pickering[3] analysis to determine the scope of an employee's protected speech:

> "First, the court must determine whether the employee speaks pursuant to his official duties. If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created. Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine whether the employee's interest in commenting on the issue outweighs the interest of the state as employer. Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in a detrimental employment decision. Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech."

the state's chief medical examiner said Wednesday they plan to contact the FBI about irregu[l]arities the doc[tor] discovered with a[] state multicounty grand jury investigation. . . . [T]rant uncovered hundreds of emails showing the grand jury was compromised. . . . Trant notified the Board about his findings and then was placed on leave.'" (Pl.'s Am. Compl., Dkt. No. 38, at 25.)

[3] See Garcetti v. Ceballos, 547 U.S. 410 (2006); Pickering v. Board of Educ., 391 U.S. 563 (1968).

Couch v. Bd. of Trs. of Mem'l Hosp., 587 F.3d 1223, 1235 (10th Cir. 2009) (quoting Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1202-03 (10th Cir. 2007)). Implicit within this five-prong analysis "'is a requirement that the public employer have taken some adverse employment action against the employee.'" Id. at 1236 (quoting Belcher v. City of McAlester, Okla., 324 F.3d 1203, 1207 n.4 (10th Cir. 2003)).

Whether an employee's speech was within that employee's job duties is a "practical" inquiry. Thomas v. City of Blanchard, 548 F.3d 1317, 1323 (10th Cir. 2008). "[A] court cannot simply read off an employee's duties from a job description because 'formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform.'" Id. (quoting Garcetti, 547 U.S. at 424-25). "[I]f an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties." Brammer-Hoelter, 492 F.3d at 1203-04.

Here, Plaintiff spoke with the press, the Board, and his colleagues about the allegedly improper behavior of the Tulsa office employees, the allegedly improper indictment of a prior investigator, and the negative implications these activities had on the agency. Plaintiff argues this speech was not within his official duties as CME because the alleged wrongdoing occurred before he was in office. This argument is not persuasive—Plaintiff's official duties were to oversee the agency and run its day-to-day operations. Part of this oversight includes managing employees, their behavior, and the consequences of that behavior, past and present.

The job duties of the CME are defined broadly by statute to include oversight of the entire OCME and must encompass communicating to the Board, the public, and employees pertinent matters to the operation of the OCME. 63 Okla. Stat. § 933 ("The Office shall be directed by the Chief Medical Examiner . . . ."); id. § 935 ("The Chief Medical Examiner shall be directly responsible to the Board for the performance of the duties provided for in this act and for the administration of the office of the Chief Medical Examiner.") (footnote omitted). Plaintiff's statements were made to the Board as part of an ongoing investigation into the agency at large and specific employees. Plaintiff's statements to the media were made in reaction to the negative publicity in an attempt to lessen the unfavorable public sentiment.[4] Plaintiff was acting "as the . . . person primarily responsible for the sound administration of the [OCME]." Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1330 (10th Cir. 2007) (finding that the Head Start Program's executive director spoke pursuant to her official duties when she reported to the school board and federal authorities, through an agent, possible legal violations within the program); Green v. Bd. of Cnty. Comm'rs, 472 F.3d 794, 800-01 (10th Cir. 2007) (finding that lab technician's speech regarding improper lab-testing techniques, although not explicitly within her required duties, was unprotected because "her activities stemmed from and were the type of activities that she was paid to do"); Brammer-Hoelter, 492 F.3d at 1204-05 (finding school teachers' speech

---

[4] In his Amended Complaint, Plaintiff states the purpose of this communication: "Plaintiff was questioned by reporters about his plan *to correct the negative image of the OCME.* Plaintiff commented to the media that he 'plan[ned] to counteract the image.'" (Pl.'s Am. Compl., Dkt. No. 38, at 12) (emphasis added).

criticizing, among other things, the school board was protected as they had "no supervisory responsibility and no duty to report"); McGee v. Pub. Water Supply, Dist. No. 2, 471 F.3d 918, 920 (8th Cir. 2006) (finding district manager's statements regarding environmental compliance were made pursuant to his official duties despite being removed from the specific project and being told by supervisors "not to concern himself with the . . . problem"). Although Plaintiff's speech—alleging improper activities of a government entity—was a matter of public concern,[5] Plaintiff's speech is more similar to that of a senior executive acting pursuant to official duties than to that of an ordinary citizen speaking on his own time.

Under the allegations of Plaintiff's Amended Complaint, Plaintiff spoke pursuant to his official duties as CME. Therefore, his speech is unprotected and the inquiry ends. See Brammer-Hoelter, 492 F.3d at 1203. A public employee's statement made pursuant to that employee's official duties is not protected since any restriction of this speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created." Garcetti, 547 U.S. at 421-22.

Because the contours of Plaintiff's freedom-of-speech rights were not sufficiently clear so that reasonable officials would understand that their actions violated that right,[6]

_____

[5] See Connick v. Myers, 461 U.S. 138, 146 (1983); Schalk v. Gallemore, 906 F.2d 491, 495 (10th Cir. 1990); Considine v. Bd. of Cnty. Comm'rs, 910 F.2d 695, 699-700 (10th Cir. 1990); Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import.").

[6] In fact, the Supreme Court has "declined to provide guidance on how [the courts] are to go about determining the appropriate scope of an employee's official duties: 'We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties

Plaintiff's § 1983 claims against Defendants in their individual capacities for violation of Plaintiff's First Amendment rights are dismissed.[7] Even if this Court found Defendants were not entitled to qualified immunity, this Court would still dismiss Plaintiff's First Amendment claims as Plaintiff's statements were made pursuant to his official duties as CME and therefore are not entitled to the protections guaranteed under the First Amendment.

## 2. Procedural Due Process

Plaintiff's next constitutional claim asserts a procedural due process violation in relation to asserted property and liberty interests. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Wilkinson v. Austin, 545 U.S. 209, 221 (2005). Because Plaintiff argues a state statute creates his asserted property interests, the relevant state statute must first be discussed.

### a. Oklahoma Open Meeting Act

The OMA was enacted to "encourage and facilitate an informed citizenry's understanding of the governmental processes and governmental problems." 25 Okla. Stat. § 302. The OMA accomplishes this goal by prescribing the procedures for and requirements of state

---

in cases where there is room for serious debate.'" Casey, 473 F.3d at 1328 n.5 (quoting Garcetti, 547 U.S. at 424). This description reinforces the ambiguity surrounding whether an employee speaks pursuant to his official duties or as a concerned citizen.

[7] In his Response to Defendants' Motions to Dismiss, Plaintiff suggests that he was owed a heightened procedure under Waters v. Churchill, 511 U.S. 661 (1994) (plurality opinion). This assertion is belied by the allegations in Plaintiff's Amended Complaint indicating his speech was within the duties of his office and therefore is unprotected.

agency meetings. State agencies must give the public notice, provide an advanced agenda and minutes, vote in open session, and give the public access to meetings. Id. §§ 303, 305, 311. The Act also prescribes punishments for violations of the Act: A willful violation results in a misdemeanor punishable by a fine up to $500.00, imprisonment for up to one year, or invalidation of actions taken during the violative meeting. Id. §§ 313, 314. Additionally, a willful violation of this Act in an executive session—a closed session statutorily allowed under certain circumstances—results in publicizing that session's minutes and records. Id. § 307. Unlike the Oklahoma Open Records Act, which provides a private right of action for declaratory and injunctive relief, the OMA does not provide a private right of action for any type of relief.[8] 51 Okla. Stat. § 24A.17.

Plaintiff argues three different theories of recovery under this Act: (1) that the OMA provides him with a private right of action so as to have a court declare that the Board's actions violated this Act's required procedure; (2) that the OMA entitles Plaintiff to a procedure the violation of which breaches an implied contract; and (3) that this Act entitles Plaintiff to a certain procedure when being terminated by the Board that equals a property interest—the violation of which would result in a denial of his property without due process of law. As this Court's subject matter jurisdiction extends to only the third theory, and the

---

[8] See Shero v. City of Grove, Okla., No. 05-CV-0137-CVE-PJC, 2006 WL 3196270, at *9-11 (N.D. Okla. Nov. 2, 2006) ("Plaintiff is not entitled to pursue a private right of action under the []OMA. The Court is reluctant to create a private right of action for members of the general public when such a right is not clearly implied by the []OMA." (citing Cannon v. Univ. of Chicago, 441 U.S. 677, 693 n.13 (1979))).

remaining state law claims are hereby remanded to state court, this Court only addresses the merits of the federal constitutional due process claim.

b. Property Interest

Plaintiff's first assertion regarding his Fourteenth Amendment procedural due process rights pertain to a claimed property interest in the proper procedure, under the OMA, being followed prior to his termination. "To have a property interest, plaintiffs 'clearly must have more than an abstract need or desire for it. [They] must have more than a unilateral expectation of it. [They] must, instead, have a legitimate claim of entitlement to it.'" Jensen v. Redev. Agency, 998 F.2d 1550, 1556 (10th Cir. 1993) (alteration in original) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)). State law governs the existence of a property interest. Id.

Here, Plaintiff's term of service as CME is governed by statute, which states the CME serves "at the pleasure" of the Board. 63 Okla. Stat. § 934. This statutory language provides the Board with broad authority as to the selection and term of the CME; it does not require any procedure or condition precedent to termination. While the OMA does require certain procedures of state agency meetings, this Court is hesitant to find this Act endows Plaintiff with a property interest in that procedure for the following reasons.

The OMA's purpose was to ensure broad public access to governmental meetings and to promote public understanding of governmental processes. It was not enacted to provide private rights to individuals, either in enforcement of the statute or as an employment procedural process. Had the state legislature intended to create restrictions on the

employment and termination of the CME, it likely would not have so broadly phrased the Board's power to fire and hire the CME under § 934. See City of Durant v. Cicio, 2002 OK 52, ¶¶ 12-14, 50 P.3d 218, 221 (finding that a statute specifically governing police officers controlled over a statute of general applicability to municipal administration, and stating that "[t]he fundamental rule of statutory construction is to ascertain and give effect to the legislative intent, and that intent is first sought in the language of a statute. . . . When the language of a statute is plain and unambiguous, no occasion exists for application of rules of construction, and the statute will be accorded meaning as expressed by the language employed").

Plaintiff cites the unpublished Tenth Circuit case Parker v. Town of Chelsea as support for this asserted property interest. However, Plaintiff's analogy to Parker as a basis for a statutory creation of a property interest is misplaced. Parker describes the implied-contract implications of procedural restrictions on termination, not whether a property right has been created in a procedure. Parker v. Town of Chelsea, 263 F. App'x 740 (10th Cir.) (unpublished), aff'd and rev'd on reh'g, 275 F. App'x 769 (10th Cir. 2008). In fact, in Parker, the district court granted the defendants' motion for summary judgment on the plaintiff's property interest due process claim, and the Tenth Circuit did not address the issue on appeal. Id. at 742 ("The district court properly concluded that [the plaintiff] was an at-will employee who, according to Oklahoma law, could be terminated 'solely for the good of the service,' and therefore could not have a protected property interest in continued employment." (citation omitted)). See also Hatfield v. Bd. of Cnty. Comm'rs, 52 F.3d 858,

863 (10th Cir. 1995) (finding that a policy manual creating an implied-in-fact employment contract, prohibiting the government employer from firing the employee except for cause, may create a legitimate claim of entitlement sufficient to create a property interest in *continued employment* under a procedural due process analysis).  For the foregoing reasons, this Court finds Plaintiff did not have a protected property interest in a procedure being followed prior to his termination, the violation of which would infringe on Plaintiff's right to procedural due process.  However, this outcome does not determine Plaintiff's state law breach-of-contract claim which is a separate issue that Plaintiff seems to conflate with a property interest in future employment.[9]

Plaintiff also argues that he held a property interest in his continued employment and that Defendants violated his rights to procedural due process when they terminated him.  A property interest in employment is recognized for procedural due process purposes if the plaintiff held a legitimate, reciprocal expectation of that continued employment.  Roth, 408 U.S. at 577.  This expectation can be created by statute, contract, or regulation that imposes

_____

[9]  In his Corrected Response to Defendants' Motions to Dismiss, Plaintiff describes his due process claim as being founded on a statute similar to an implied contract theory: "Plaintiff's basis for a right to due process is threefold.  First, Plaintiff alleges that as a result of the statutory scheme of Title 63, Oklahoma Statutes, and the Open Meeting[] Act, Plaintiff had a limited property interest in compliance with the statutory requirements before being deprived of his position.  This 'property interest' claim is related to the implied contract claim previously discussed.  Thus, a statute may create an implied contract, as can procedural rights."(Pl.'s Br., Dkt. No. 58, at 12) (citations omitted).  "It is submitted that these procedures are mandated by law and limit the power of the Board to discharge at will.  Under these circumstances, a property right is established."  (Id. at 18; see also Pl.'s Am. Compl., Dkt. No. 38, at 49-50.)  Since Plaintiff's remaining state law claims are herein remanded, this Court will not address Plaintiff's assertion of an implied contractual right to the statutory procedure.

substantive restrictions on the discretion to terminate employees.  <u>Darr v. Town of Telluride, Colo.</u>, 495 F.3d 1243, 1251 (10th Cir. 2007).  The general presumption under Oklahoma law is that employees serve at the will of their employer.  <u>Hayes v. Eateries, Inc.</u>, 1995 OK 108, ¶ 8, 905 P.2d 778, 781.

Additionally, a state statute granting to a supervising body broad discretion as to the term of employment forecloses an employee's assertion of a property interest in that continued employment.  <u>See</u> <u>Campbell v. Mercer</u>, 926 F.2d 990, 993 (10th Cir. 1991) (finding that language "for the good of the service" was not sufficient to create a property interest); <u>Parker</u>, 263 F. App'x at 742 (affirming summary judgment for defendants on due process claim when statutory language described employment as continuing "solely for the good of the service"); <u>Bunch v. Indep. Sch. Dist. No. I-050</u>, No. 09-CV-0458-CVE-FHM, 2010 WL 3368447, at *7-8 (N.D. Okla. Aug. 20, 2010) (finding that a school board lacked the power to change the nature of an at-will employment when the school district treasurer's term was statutorily set as "serv[ing] at the pleasure of the board").  Because Plaintiff's employment as CME continued "at the pleasure" of the Board, 63 Okla. Stat. § 934, Plaintiff's argument that he held a property interest in his future employment as CME is unpersuasive, and his claims alleging denial of procedural due process pertaining to those alleged property interests are dismissed.

### c.  Liberty Interest

Finally, Plaintiff claims that Defendants violated his right to due process concerning his liberty interests.  Under the Due Process Clause, a public employee is entitled to certain

procedures when a government employer threatens an employee's established liberty interest. The Tenth Circuit employs a four-part test that a plaintiff must satisfy to establish a liberty interest sufficient to trigger due process protections:

> "First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. And fourth, the statements must be published. These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest."

Evers v. Regents of Univ. of Colo., 509 F.3d 1304, 1308 (10th Cir. 2007) (quoting Workman v. Jordan, 32 F.3d 475, 481 (10th Cir. 1994)). If an employee establishes a liberty interest deprivation, then that employee is entitled to a name-clearing hearing. Id.

However, defamation alone is not enough to establish a claim for deprivation of a liberty interest—Plaintiff must allege that his reputation was damaged in connection with an adverse action by his government employer. Stidham v. Peace Officer Standards & Training, 265 F.3d 1144, 1153 (10th Cir. 2001) ("'[D]efamation, standing alone, [is] not sufficient to establish a claim for deprivation of a liberty interest.'" (alteration in original) (quoting Renaud v. Wyo. Dep't of Family Servs., 203 F.3d 723, 726-27 (10th Cir. 2000))); Flanagan v. Munger, 890 F.2d 1557, 1571-72 (10th Cir. 1989).

In addition to the stigmatizing statements, a plaintiff must allege and present evidence of some further interest that is entangled with the stigmatizing statements, such as a "present harm to established business relationships." Jensen, 998 F.2d at 1558-59. "Damage to prospective employment opportunities is too intangible to constitute deprivation of a liberty

interest." Id.; Phelps v. Wichita Eagle-Beacon, 886 F.2d 1262, 1269 (10th Cir. 1989) ("Thus, even if defendants' actions made plaintiff less attractive to employers or clients, that is insufficient to state a deprivation of a liberty or property interest under Section 1983."). However, an employee does not need to prove an actual denial of a job opportunity if he can prove termination was based on the stigmatizing statements. Melton v. Okla. City, 928 F.2d 920, 927 n.11 (10th Cir. 1991) ("It is sufficient that a plaintiff prove termination based upon a publicized false charge of sufficient opprobrium that would make the plaintiff an unlikely candidate for employment by a future employer.").

Defendant Jordan's statements to the Board while in executive session and the Board's discussion of Plaintiff's employment while in meetings do not meet the public or published requirements to trigger a liberty interest under due process. See Lentsch v. Marshall, 741 F.2d 301, 303-04 (10th Cir. 1984). However, Defendant Jordan's statement to the newspaper media impugning Plaintiff's veracity and competency is of the nature of statements that can trigger the protections afforded in the Due Process Clause—when coupled with a tangible harm. Defendant Jordan's statement to the newspaper was made after Plaintiff was terminated and was not the basis for his termination, so Plaintiff must show a tangible harm foreclosing future opportunities in order to successfully establish a liberty interest, which Plaintiff has failed to allege.

Plaintiff pleads in his Complaint that he "suffered direct economic loss" and that "numerous potential clients . . . failed . . . to hire Plaintiff," but these allegations—even when viewed by this Court in a light most favorable to Plaintiff—are insufficient to satisfy the level

of tangible harm required for a liberty interest due process claim.[10] (Pl.'s Am. Compl., Dkt. No. 38, at 27); see Jensen, 998 F.2d at 1558-59 (finding that plaintiff's allegations that defendants harmed his reputation and "deter[red] third persons from associating or dealing with [him]" failed to allege a violation of a liberty interest).

Additionally, a reasonable official would not likely know that the statements of the type Defendant Jordan made clearly violated Plaintiff's liberty interest under due process. Because this Court finds that Plaintiff failed to sufficiently plead a liberty interest triggering due process protections and that Defendant Jordan is entitled to qualified immunity, as would the remaining Defendants had their statements in the meetings met the applicable standards, Plaintiff's § 1983 claim against Defendants in their individual capacities for deprivation of his right to due process regarding his asserted liberty interest is dismissed.

### C. Remaining State Causes of Action

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if that court has dismissed all claims over which it had original jurisdiction. Id. Additionally, under § 1367(c)(1), a district court has the same discretion when the supplemental claims raise novel or complex issues of state law. Id. § 1367(c)(1). See Gaston v. Ploeger, 297 F. App'x 738, 746 (10th Cir. 2008) (unpublished) (finding that § 1367(c) permits remand of remaining state law claims when no federal question claims remain). Once a court's discretion is triggered under this provision, that discretion should

---

[10] However, "so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a [§ 1983] action." Siegert v. Gilley, 500 U.S. 226, 234 (1991).

be exercised after considering "the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness [that] would be served by retaining jurisdiction." Thatcher Enters. v. Cache Cnty. Corp., 902 F.2d 1472, 1478 (10th Cir. 1990).

Here, Defendants removed to this Court based on Plaintiff's § 1983 claims asserting violations of his federally protected constitutional rights pursuant to 28 U.S.C. § 1331 subject matter jurisdiction. No party asserts diversity jurisdiction. The parties have engaged in some discovery, but have not submitted pretrial materials. Plaintiff's remaining claims all sound in state law, some of which depend on novel issues of state law.[11] Judicial economy is served by an Oklahoma court resolving issues of Oklahoma law. Consequently, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and herein remands those claims to state district court. See Smith v. City of Enid, 149 F.3d 1151, 1156 (10th Cir. 1998) (noting that "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims").

---

[11] The state constitutional protections regarding freedom of speech, under Okla. Const. art. 2, § 22, are broader than the federal protections, see Brock v. Thompson, 1997 OK 127, ¶ 16 n.33, 948 P.2d 279, 288 n.33, and this Court finds no state case law determining whether the Garcetti-Pickering analysis applies to employment retaliation claims arising under state constitutional law. Thus, this issue seems to be one novel to state law. See Acevedo v. City of Muskogee, 1995 OK 37, ¶¶ 8-14, 897 P.2d 256, 261-62 (applying Pickering and Connick to a federal constitutional claim, but not a state constitutional claim).

## V. CONCLUSION

For the reasons set forth herein, Defendants' Motions to Dismiss (Dkt. Nos. 44, 45, 46)[12] are herein PARTIALLY GRANTED as to Plaintiff's fourteenth, fifteenth, and sixteenth causes of actions, while Plaintiff's remaining causes of action, numbers one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, seventeen, eighteen, and nineteen, are hereby REMANDED to the District Court of Oklahoma County, Oklahoma. As to Plaintiff's Motion to Adjudicate Civil Contempt (Dkt. No. 51), this Court leaves decision on this motion for the state court, as any ruling on this motion would require this Court's ongoing supervision. Defendants' Motions to Dismiss (Dkt. Nos. 16, 17, 18, 20, 26) are moot.

IT IS SO ORDERED this 13th day of October, 2010.

ROBIN J. CAUTHRON
United States District Judge

---

[12] Defendants' Motions to Dismiss (Dkt. Nos. 16, 17, 18, 20, 26) were mooted after Plaintiff filed his Amended Complaint. Mink v. Suthers, 482 F.3d 1244, 1254 (10th Cir. 2007) ("[A]n amended complaint 'supercedes an original complaint and renders the original complaint without legal effect.'" (quoting In re Atlas Van Lines, Inc., 209 F.3d 1064, 1067 (8th Cir. 2000))).