IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

COLLIE M. TRANT,                      )
                                      )
                    Plaintiff,        )
                                      )
vs.                                   )        Case Number CIV-10-555-C
                                      )
STATE OF OKLAHOMA ex rel.             )
BOARD OF MEDICOLEGAL                  )
INVESTIGATIONS, et al.,               )
                                      )
                    Defendants.       )

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

Plaintiff Collie M. Trant brought the present suit seeking declaratory and monetary relief against fourteen Defendants, including the State of Oklahoma and members of the Board of Medicolegal Investigations ("Board") in their individual and official capacities, under nineteen various causes of actions sounding in federal and state law.  As Plaintiff concedes, a Tenth Circuit ruling has foreclosed his third, tenth, eleventh, twelfth, thirteenth, fifteenth, sixteenth, and nineteenth causes of action.  This Court granted Defendants' second Motion to Dismiss (Dkt. No. 88) as to Plaintiff's first, fourth, fifth, sixth, and eighth causes of action.  Thus, after the dismissal stage, Plaintiff's surviving causes of action include:  his second cause of action against Defendants in their official capacities; his seventh, ninth, and

fourteenth causes of action against Defendants individually; and his seventeenth and eighteenth causes of action against the State of Oklahoma.[1]

Defendants have filed multiple motions for summary judgment:  the State of Oklahoma and Dewayne Andrews, Douglas Stewart, Rocky McElvany, C. Michael Ogle, Charles Curtis, Karlis Sloka, Chris Ferguson, Shanda McKenny, Sandra Balzer, Tom Jordan, and Cherokee Ballard in their official capacities (collectively "State Defendants") have moved for summary judgment on Plaintiff's second, seventeenth, and eighteenth causes of action (Dkt. No. 155); Defendants Chris Ferguson, Douglas Stewart, Rocky McElvany, C. Michael Ogle, Shanda McKenny, Charles Curtis, and Karlis Sloka in their individual capacities (collectively "Board Defendants") have moved for summary judgment on Plaintiff's seventh, ninth, and fourteenth causes of action (Dkt. No. 157); Defendants Tom Jordan and Cherokee Ballard have moved for summary judgment on Plaintiff's seventh, ninth, and fourteenth causes of action (Dkt. No. 156); and Defendant Sandra Balzer has moved for summary judgment on Plaintiff's seventh, ninth, and fourteenth causes of action (Dkt. No. 153).  For reasons more fully set forth herein, the Court now dismisses Plaintiff's second cause of action, grants summary judgment to all Defendants on Plaintiff's fourteenth cause of action, and remands Plaintiff's remaining claims back to state court.

## II.  LEGAL STANDARD

---

[1]   The underlying facts of this case have been outlined in this Court's previous Order governing the Defendants' first round of motions to dismiss.  (See Order of Oct. 13, 2010, Dkt. No. 68, at 2-6.)

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it affects the disposition of the substantive claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citation omitted). If the movant satisfactorily demonstrates an absence of genuine issue of material fact with respect to a dispositive issue for which the non-moving party will bear the burden of proof at trial, the non-movant must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. A court considering a summary judgment motion must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).

## III.  DISCUSSION

### A.  Sovereign Immunity & Standing

The Oklahoma Legislature enacted the Oklahoma Open Meeting Act ("OMA"), 25 Okla. Stat. § 301 et seq., "to encourage and facilitate an informed citizenry's understanding of the governmental processes and governmental problems." Id. § 302. To give the Act

teeth, § 314 makes it a misdemeanor for any person to willfully violate the OMA and § 313 provides that "[a]ny action taken in willful violation of [the Act] shall be invalid" (footnote omitted).  Plaintiff's second cause of action seeks a declaratory judgment that the State Defendants willfully violated the OMA—making their actions void—by preventing Plaintiff from fully participating in executive sessions of the Board, failing to provide adequate notice, and posting inadequate agendas for Board meetings.  However, because Plaintiff lacks Article III standing, the Court cannot determine the merits of his OMA claims.

The United States Constitution limits federal courts to deciding "cases" and "controversies."  U.S. Const. art. III, § 2.  Therefore, "[w]ithout a live, concrete controversy, [the Court] lack[s] jurisdiction to consider claims no matter how meritorious."  Mink v. Suthers, 482 F.3d 1244, 1253 (10th Cir. 2007).  The Supreme Court has held that "standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  To establish standing, a plaintiff must demonstrate an injury in fact that is traceable to the defendant and would "'likely' . . . be 'redressed by a favorable decision'" of the Court.  Id. (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)).

The State Defendants attack Plaintiff's standing on redressability grounds, arguing that his only injury—his termination during the February 5, 2010, meeting—is no longer redressable, given that the position of Chief Medical Examiner has been filled and reinstatement is not possible.  (State Defs.' Br., Dkt. No. 155, at 5-6 (citing Opala v. Watt, 454 F.3d 1154, 1160 (10th Cir. 2006) (holding plaintiff's injury not redressable because the

court "simply [could not] make Justice Opala Vice-Chief Justice again" by declaring the challenged rule unconstitutional); Shore v. Fed. Express Corp., 777 F.2d 1155 (6th Cir. 1985) (noting the parties' agreement that reinstatement would be inappropriate because the position had been filled several years before)).)  The State Defendants also assert that Plaintiff lacks standing to challenge any alleged OMA violations occurring at other meetings because voiding those actions would not afford Plaintiff any kind of meaningful relief for his injury-in-fact.  (State Defs.; Br., Dkt. No. 155, at 7-8.)

Plaintiff disputes the State Defendants' characterization of both his injury and the relief available to him.  First, Plaintiff "fundamentally disagrees with [the State] Defendants [sic] suggestion that the controversy herein relates solely to the February 5 meeting."  (Pl.'s Resp. to State Defs.' Br., Dkt. No. 179, at 11.)  According to Plaintiff, the Court must consider more than just the economic injury resulting from his termination, instead including any "non-economic injury which is within the power of the court to redress."  (Id.)  As an example of such a non-economic injury, Plaintiff cites the Board's action of placing him on "Administrative Leave."  According to Plaintiff, the Board placed him on a type of leave used only when necessary to address a potentially violent occurrence in the workplace. Plaintiff contends that the resulting "poison[ing of] his employment record and stigmatiz[ation of] his reputation," would be redressable if the Court "invoke[d its] equitable powers . . . to expunge this from [Plaintiff's] record."  (Id. at 11-12.)

However, the Court disagrees with Plaintiff that the Board "poisoned" his reputation by implying he was being placed on leave out of a concern of violence.  The public motion

5

to place Plaintiff on paid leave, passed at the February 1, 2010, meeting, did not contain any reference whatsoever to violent conduct or Okla. Admin. Code 530:10-15-50, the provision authorizing administrative leave "as a 'cooling off period to defuse a potentially violent occurrence in the work place.'" (Pl.'s Resp. to Statement of Facts, Dkt. No. 189, at 53.)  The motion instead stated that Plaintiff was being placed on paid leave during the pendency of an investigation.  (Id.)  Placing Plaintiff on paid leave was well within the Board's authority without reliance on the regulation cited by Plaintiff.  During his tenure as Chief Medical Examiner ("CME"), Plaintiff "serve[d] at the pleasure of the Board."  63 Okla. Stat. § 934. As noted by the Tenth Circuit, "the underlying premise for [Plaintiff's] position—that the CME's 'serv[ice] at the pleasure of the Board' does not afford the Board the authority to suspend a CME—is specious."  Trant v. Oklahoma, 426 F. App'x 653, 664 n.4 (10th Cir. 2011).  Merely because the State of Oklahoma grants its employees the right to paid administrative leave to defuse violent situations does not mean that an arm of the State cannot choose to place an at-will, unclassified officer on paid leave for another reason.  As Plaintiff has not cited any other potential non-economic injuries stemming from the State Defendants' other alleged infractions, the Court agrees with the State Defendants that "the only issue which Plaintiff may have **standing** to raise" relates to the State Defendants' conduct at the February 5, 2010, meeting.  (See State Defs.' Br. at 7 (emphasis in original).)

With respect to his termination, Plaintiff contends that the State Defendants misunderstand the nature of the remedy afforded to him by the Declaratory Judgment Act.[2] Plaintiff argues that he is not limited to seeking reinstatement through his second cause of action because the "further relief" provision of the Declaratory Judgment Act and this Court's "inherent equitable powers" provide "a significant degree of flexibility in fashioning an appropriate remedy." (Pl.'s Resp. to State Defs.' Br. at 12-13.) Thus, Plaintiff asserts his entitlement to "the emoluments of his position during the period he has unlawfully been removed from office." (Id. at 14.) Oklahoma case law holds that a wrongfully suspended officer must be paid his or her salary for the period of suspension even though another "de facto officer" has already been paid for that same time period. See Bd. of Cnty. Comm'rs of Okla. Cnty. v. Litton, 1957 OK 139, ¶ 13, 315 P.2d 239, 243. However, whereas Litton involved a proceeding by a former county commissioner, this case involves a proceeding against the State of Oklahoma, raising Eleventh Amendment issues not present in Litton. The State Defendants correctly point out that sovereign immunity bars Plaintiff from seeking this type of "further relief." (State Defs.' Br. at 5.)

---

[2] Plaintiff fails to acknowledge the Court's earlier finding that the federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., applies to Plaintiff's claims, not the Oklahoma Declaratory Judgment Act, 12 Okla. Stat. § 1651 et seq. (Order of March 19, 2012, Dkt. No. 108, at 3-4 n.2.) However, as 28 U.S.C. § 2202 contains similar language to 12 Okla. Stat. § 1655, the Court will construe Plaintiff's argument as seeking relief under the federal provision. Compare 28 U.S.C. § 2202 ("Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.") with 12 Okla. Stat. § 1655 ("Further relief based upon a determination of rights, status, or other legal relations may be granted whenever such relief becomes necessary and proper after the determination has been made.").

Under the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman v. Jordan, 415 U.S. 651, 663 (1974). A state can waive its immunity by consenting to suit, but the requirements for doing so are strict. Estes v. Wyo. Dep't of Transp., 302 F.3d 1200, 1203 (10th Cir. 2002). A waiver must be "'unequivocal'" and "'specifically applicable to federal-court jurisdiction.'" Id. (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985)). Courts have found such an unequivocal waiver when a state removes a case from state court to federal court. See Lapides v. Bd. of Regents, 535 U.S. 613, 619-20 (2002); Estes, 302 F.3d at 1204 (interpreting Lapides to apply to the removal of federal claims, as well as state-law claims).

In this case, the State Defendants voluntarily consented to the removal of Plaintiff's case from state to federal court, seemingly waiving their immunity. However, on May 27, 2010, when the State Defendants filed their Notice of State's Non-Objection of Removal (Dkt. No. 8), they expressly "reserve[d] 10th and 11th Amendment Rights as to any future claims." Because the State Defendants waived their immunity only as to the action described in the Notice of Removal, Plaintiff cannot now try to backdoor a damages award and thwart the State's reserved sovereign immunity by asking for relief not initially sought in his Amended Petition of May 6, 2010. (See Notice of Removal, Ex. 13.) Thus, the only relief the Court could grant Plaintiff would be a declaratory judgment that the State Defendants' February 5, 2010, termination of him was void, reinstating him to the position of Chief

Medical Examiner.  As reinstatement is no longer possible, Plaintiff's second cause of action is not redressable, meaning the Court does not have jurisdiction to hear Plaintiff's claim.

## B.  First Amendment Retaliation

Plaintiff's fourteenth cause of action alleges that in January and February of 2010 he and his attorney made various communications protected by the First Amendment to the United States Constitution.  (Am. Compl., Dkt. No. 38, at 47-48.)  According to Plaintiff, these statements were what motivated the Board Defendants, Defendants Jordan and Ballard, and Defendant Balzer to suspend Plaintiff, discharge Plaintiff, and release stigmatizing information about Plaintiff to the media.  (Id. at 48.)  Plaintiff theorizes that the named Defendants retaliated against him "to chill Plaintiff and others from making similar reports of wrongdoing."  (Id.)

A five-step inquiry known as the "Garcetti/Pickering"[3] analysis generally governs freedom of speech retaliation claims for public employees.  Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1202 (10th Cir. 2007).  First, the Court determines whether the employee's speech was made as a private citizen or "'pursuant to [his] official duties.'"  Id. (quoting Garcetti, 547 U.S. at 421).  If the Court finds that the employee spoke as a private citizen, it moves to the second step of the Garcetti/Pickering analysis and asks "whether the subject of the speech is a matter of public concern."  Id.  The Court proceeds to the third step—a balancing inquiry—only if the employee's speech was a matter of public

---

[3]  See Garcetti v. Ceballos, 547 U.S. 410 (2006); Pickering v. Bd. of Educ., 391 U.S. 563 (1968).

concern. Id. at 1203. If "the employee's interest in commenting on the issue outweighs the interest of the state as employer," the employee must demonstrate that his speech was a substantial or motivating factor in an adverse employment action. Id. Finally, if the employee succeeds in establishing that the protected speech was such a motivating factor, the employer may show that it would have taken the same adverse action against the employee, even in the absence of the employee's speech. Id. Although the first three steps involve questions of law, the trier of fact generally resolves the last two. Id. The Tenth Circuit has already concluded that two of the communications cited by Plaintiff—his threats to retain counsel and to report wrongdoing to outside authorities—triggered First Amendment protection because they fell outside the scope of Plaintiff's employment, satisfying the first part of the Garcetti/Pickering analysis. Trant, 426 F. App'x at 659.

1.  Board Defendants

The Board Defendants argue that summary judgment is appropriate on Plaintiff's First Amendment retaliation claim because Plaintiff's two protected communications fail to satisfy the remaining Garcetti/Pickering prongs. First, the Board Defendants claim that because Plaintiff's speech "was motivated by purely personal interests," it was not a matter of public concern, as required by the second step of Garcetti/Pickering. (Bd. Defs.' Br., Dkt. No. 157, at 12-13.) Speech is a matter of public concern when it is "of interest to the community," rather than a "'grievance[] of a purely personal nature.'" Brammer-Hoelter, 492 F.3d at 1205 (citing Lighton v. Univ. of Utah, 209 F.3d 1213, 1225 (10th Cir. 2000)). Statements involving illegality or impropriety by public officials are usually matters of public concern.

Id. at 1205-06.  The context of Plaintiff's speech makes his motivation unclear, particularly in the case of Plaintiff's statement to the Board in closed executive session.  The facts indicate the Plaintiff was concerned about a conflict that had arisen between himself and Tom Jordan and believed that one of them might be terminated.  (See Defs.' Joint Mot. for Summ. J., Dkt. No. 153, Ex. 20 ("This is long, but a lot has happened since Tom arrived. When you make the choice between keeping me or keeping Tom, I would like for you to consider these things.").)  However, Plaintiff's statements also related to wrongdoing he had discovered—the tainting of a grand jury—which was a matter of public concern.  Because the Board Defendants' Motion can be resolved at a later step of the Garcetti/Pickering analysis, the Court assumes, without deciding, that Plaintiff's speech involved a matter of public concern.

Under the third prong of Garcetti/Pickering, the Board Defendants must establish, as a threshold matter, "'that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee.'"  See Trant, 426 F. App'x at 661 (quoting Dixon v. Kirkpatrick, 553 F.3d 1294, 1304 (10th Cir. 2009)).  This burden requires the Board Defendants to establish that "the speech itself" would directly disrupt the medical examiner's office's "internal operations and employment relationships."  Brammer-Hoelter, 492 F.3d at 1207 (emphasis in original).  Although the Board Defendants argue that many of Plaintiff's "activities" were "highly disruptive to the operations of the agency," they have not met their burden to show that Plaintiff's protected conduct—his threats to hire counsel and disclose certain information to outside authorities—was itself disruptive.  (Bd.

Defs.' Br. at 15 (emphasis added).)  Thus, the Court must move to steps four and five of the

Garcetti/Pickering analysis.

It is clear that Plaintiff has sufficiently established that there is a fact question with

respect to the fourth prong of Garcetti/Pickering.  Personal notes, taken during the Board's

executive session on February 5, 2010, show that Plaintiff's threat to hire an attorney or sue

the Board was at least a consideration in Plaintiff's termination, whether or not it was a

"substantial" or "motivating" factor.  (See Pl.'s Resp. to Statement of Facts, Ex. 112.)

However, even if Plaintiff's protected conduct was a motivating factor, the Board Defendants

have "demonstrate[d] that [they] would have taken the same action against [Plaintiff] even

in the absence of the protected speech."  Brammer-Hoelter, 492 F.3d at 1208 (citing Lybrook

v. Members of Farmington Mun. Sch. Bd. of Educ., 232 F.3d 1334, 1338-39 (10th Cir.

2000)).  For example, the Board Defendants have pointed out instances of sexual harassment

perpetrated by Plaintiff.  (Bd. Defs.' Br. at 24-25.)  Notably, Plaintiff does not dispute that

the conduct at issue[4] occurred, only its characterization.  (Id.)  The Office of the Chief

Medical Examiner ("OCME") had recently been the focus of a grand jury investigation into

allegations of sexual harassment and battery, with the grand jury left "wonder[ing] whether

the former chief investigator's behavior would have escalated to criminal conduct had the

grievances for sexual harassment been properly handled."  (Defs.' Joint Mot. for Summ. J.,

---

[4] Plaintiff admits that the month before his suspension he told a subordinate that she should model clothing from Victoria's Secret for him because of the size of her breasts.  (See Defs.' Joint Mot. for Summ. J., Dkt. No. 153, at 12 (citing Ex. 4, at 100-01).)  Plaintiff also admits that he referred to the same subordinate as a "bitch" in the presence of another employee.  (See id. at 13 (citing Ex. 3, at 184; Ex. 27, at 37-38).)

Dkt. No. 153, Ex. 6, at 4.)  Given this, the Board's immediate suspension of Plaintiff, with pay, was an appropriate response to allegations of sexual harassment.  The Board Defendants also note Plaintiff's insubordination in contacting OCME employees in contradiction of the Board's directive as alternative grounds for his termination.  (Bd. Defs.' Br. at 25.)  Again, Plaintiff does not deny that he attempted to contact agency employees during his suspension, instead contesting only the characterization of this as insubordination, given his understanding of the Board's directive.  (Pl.'s Resp. to Bd. Defs.' Br., Dkt. No. 180, at 19.)

Despite arguing that these grounds are merely "pretext," Plaintiff has failed to provide any evidence actually contradicting Defendants' stated reasons for termination.  (See id. at 18.)  Thus, there is no issue of fact as to whether "'but for' [Defendants'] alleged retaliatory motive, Plaintiff's employment would not have been terminated."  Dodson v. Bd. of Cnty. Comm'rs, Case No. 11-CV-01682-WJM-KLM, 2012 WL 2878009, at *16 (D. Colo. Jul. 13, 2012); see also Couch v. Bd. of Trs. of Mem'l Hosp. of Carbon Cnty., 587 F.3d 1223, 1244-45 (10th Cir. 2009).  Therefore, Plaintiff's fourteenth cause of action cannot survive. Summary judgment for the Board Defendants is appropriate.

2.  Defendants Jordan & Ballard

Defendant Cherokee Ballard has been employed by the Office of the Chief Medical Examiner ("OCME") since August 2008 as medical legal executive administrator, public information officer, and legislative liaison.  (Pl.'s Resp. to Statement of Facts, Ex. 32, at 5-6.) Defendant Tom Jordan has served as Chief Administrative Officer of the OCME since December 2009.  (Pl.'s Resp. to Statement of Facts at 8.)  Both Defendants were subordinate

to Plaintiff during Plaintiff's tenure as Chief Medical Examiner ("CME").  63 Okla. Stat.

§ 933 ("The Office shall be directed by the Chief Medical Examiner, and the Chief Medical

Examiner may employ such other staff members as the Board shall specify.").  Defendants

Jordan and Ballard move for summary judgment on Plaintiff's fourteenth cause of action on

the basis of their status as subordinate employees.

As support for their argument that only final decision-makers may be held liable for

free speech retaliation claims, Defendants Jordan and Ballard rely on authority from outside

the Tenth Circuit.  See Johnson v. Louisiana, 369 F.3d 826, 831 (5th Cir. 2004); Beattie v.

Madison Cnty. Sch. Dist., 254 F.3d 595, 603 (5th Cir. 2001).  In Johnson, the Fifth Circuit

held that "only final decision-makers may be held liable for First Amendment retaliation

employment discrimination under § 1983" because of Pickering's causation requirement.

Id.  However, although the Tenth Circuit has not directly decided whether a subordinate can

be liable for free speech retaliation under the First Amendment, the Tenth Circuit has rejected

the Fifth Circuit's strict final decision-maker rule, recognizing that "an alternative to the

Pickering balancing is warranted when allegations of retaliatory conduct are directed at a

defendant who is not the plaintiff's employer."  Worrell v. Henry, 219 F.3d 1197, 1212 (10th

Cir. 2000); see also Leverington v. City of Colo. Springs, 643 F.3d 719, 729 (10th Cir. 2011).

In such a case, the three-part Worrell test applies to free speech retaliation claims instead of

Pickering, meaning a plaintiff must prove:

> "(1) that the plaintiff was engaged in constitutionally protected activity;
> (2) that the defendant's actions caused the plaintiff to suffer an injury that
> would chill a person of ordinary firmness from continuing to engage in that

activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."

Leverington, 643 F.3d at 729 (quoting Worrell, 219 F.3d at 1212).

The issue of whether the Court should apply Garcetti/Pickering or Worrell has not been briefed by the parties because Plaintiff did not raise Worrell until his Supplemental Response Brief (Dkt. No. 207), where he included a one-sentence reference. Nonetheless, the Court must determine whether the three-part Worrell test should control Plaintiff's claims against Defendants Ballard and Jordan instead of Garcetti/Pickering. Initially, because neither Ballard nor Jordan was Plaintiff's employer, it seems as though Worrell should apply. However, neither Worrell nor Leverington, one of its more recent applications, directly extends liability to a true subordinate employee. Instead, Worrell[5] and Leverington[6] involved

_____

[5]   In Worrell, a narcotics agent refused to work with the plaintiff, who had been offered the position of coordinator of the District Attorney's drug task force, because of the plaintiff's prior testimony for a defendant in a capital murder trial. Worrell, 219 F.3d at 1202. Based on this refusal, the District Attorney rescinded the job offer he had made to the plaintiff, given that the District Attorney felt that cooperation and coordination with the Oklahoma narcotics agent was essential to successfully coordinating the drug task force. Id. In such a situation, the Court noted that "[b]y withholding cooperation, the third party [upon whose cooperation the employer depended] could effectively create the very workplace disruption that, under the Pickering approach, could be used to justify the limitation of First Amendment rights." Id. at 1211. Thus, the Court adopted a different approach for these third parties who were "neither an employer nor a party to a contract with the plaintiff." Id. at 1213.

[6]   The situation in Leverington also involved a true third party, rather than a subordinate employee of the plaintiff. In that case, a police officer pulled over the plaintiff, a nurse, for speeding and wrote her a ticket. Leverington, 643 F.3d at 722. After "'their conversation became less than cordial,'" the plaintiff told the officer that "'she hoped she never had him as a patient,'" to which the officer replied, "'I hope not too, because maybe I'll call your supervisor and tell her you threatened me.'" Id. The officer in fact contacted the plaintiff's supervisors and told them he had been threatened by her, after which the plaintiff was terminated. Id. The Court noted that the Worrell test, rather than Garcetti/Pickering, governed the plaintiff's claims against the police officer,

situations where outside third-parties influenced the final decision-maker to take the adverse action at issue.  For the sake of argument, the Court recognizes the possibility of subordinate liability and applies Worrell to Defendants' Motion.  Because the Tenth Circuit has already decided under Garcetti/Pickering that Plaintiff engaged in constitutionally protected speech when he threatened to hire an attorney and disclose certain information to outside authorities, see Trant, 426 F.App'x at 659, the Court considers only the second and third prongs of Worrell here, which focus on "the effect of the defendant's actions, and the defendant's intent."  Worrell, 219 F.3d at 1213.

Plaintiff argues that Defendant Jordan "active[ly] participa[ted] in a retaliation scheme" against Plaintiff when he twice made negative comments about Plaintiff to the media and encouraged Representative Randy Terrill to issue a press release asserting Plaintiff had stolen property from the OCME.  (Pl.'s Resp. to Defs. Ballard & Jordan's Br., Dkt. No. 187, at 4-5.)  Plaintiff charges Defendant Ballard with participating in the reports made to the media that Plaintiff had stolen items from the OCME and in the Terrill press release.  (Id. at 5.)  Because Plaintiff offers no evidence[7] that Defendant Jordan "encouraged" Representative Terrill to issue a press release or that Defendant Ballard "participated" in the creation of the press release, the Court considers only Plaintiff's allegations about

as her claim was for First Amendment retaliation against someone other than her employer.  Id. at 728.

[7]  Evidence of the press release's existence is not evidence that Tom Jordan or Cherokee Ballard participated in the creation of the release or encouraged its issuance.  (See Pl.'s Resp. to Statement of Facts, Ex. 110.)  Nor does media coverage of the release establish participation or encouragement by Defendants.  (See id., Exs. 116-17, 120-21.)

Defendants' allegedly stigmatizing statements to the media.  (See Defs. Ballard & Jordan's Reply Br., Dkt. No. 197, at 5; Defs.' Reply to Pl.'s Resp. to Statement of Facts, Dkt. No. 201, at 19.)

a.  Defendant Ballard

In his Response to Defendant Ballard's Motion, Plaintiff asserts that Defendant Ballard retaliated against him in violation of his free speech rights by "participat[ing] in reporting to the media that Plaintiff had stolen items from the OCME."  (Pl.'s Resp. to Defs. Ballard & Jordan's Br. at 5.)  Plaintiff does not include any citations to record evidence of Defendant Ballard's statements.  However, after reviewing Plaintiff's exhibits, the Court found two instances where Defendant Ballard spoke to the media about the property allegedly missing from the OCME.  (See Pl.'s Resp. to Statement of Facts, Exs. 121-22.)  In both cases, reporters were present at the OCME for a media event initiated by Scott Adams, Plaintiff's attorney.  While present, the reporters asked Defendant Ballard about the allegedly missing evidence.  Defendant Ballard explained that a Tulsa log showed that Plaintiff had checked the evidence out of the Tulsa office with the intention of bringing it to Oklahoma City, but that employees could not find the evidence or any record of its arrival.  Although Defendant Ballard indicated that she believed the evidence to be in Plaintiff's possession, given the Tulsa log entry, she did not refer to the evidence as "stolen."  Responding to media inquiries prompted by the actions of Plaintiff's own attorney is not retaliatory or malicious behavior, despite the assertions of Plaintiff.  As Plaintiff has presented no evidence to the

contrary, summary judgment on Plaintiff's First Amendment claim is appropriate for Defendant Ballard under the third prong of Worrell.

b.  Defendant Jordan

With respect to Defendant Jordan, Plaintiff claims that Jordan "twice advised the media that Plaintiff was inept or incompetent, was a liar and was mentally unstable." (Pl.'s Resp. to Defs. Ballard & Jordan's Br. at 4.)  Although Plaintiff did not include citations to the record, the Court assumes that Plaintiff refers to the statements reported by The Oklahoman in the February 5, 2010, and February 6, 2010, newspapers.[8]  (See Pl.'s Resp. to Statement of Facts, Ex. 107-08.) On February 5, 2010, The Oklahoman ran a story stating that Tom Jordan, the new chief administrative officer at the OCME, "confirmed Thursday he told the board Trant is a liar and inept," but "said he could not explain his comments because he spoke in executive session."  (Id., Ex. 107, at 1.)  The next day, Jordan was quoted as saying "I don't think the man's competent to run the agency.  I'm not sure he's mentally stable.  And he has fabricated . . . or embellished many of the statements he's made both . . . in executive sessions of the board meeting and to the media." (Id., Ex. 117, at 2.) However, in Jordan's deposition, taken April 30, 2010, he denied having had any conversations with the media, instead claiming that any media quotes attributed to him actually came from statements he made at the January meeting at the State Capitol,

---

[8]  The Court notes the inconvenience caused by Plaintiff's attachment of illegible exhibits. Next time, Plaintiff would be wiser to include newspaper clippings blown up to a font size that is actually large and clear enough to read without the use of a magnifying glass.

subsequently circulated via an email written by <u>Plaintiff</u> to a Board member.  (<u>Id.</u>, Ex. 50, at

132.)  Plaintiff argues that he does not take issue with Defendant Jordan's "personal feelings

toward Plaintiff," which clearly existed prior to Plaintiff engaging in any protected conduct,

but rather Jordan's decision to "[take] those feelings to the media in an effort to discredit

Plaintiff after Plaintiff hired a lawyer and threatened to take [information] to the FBI."  (Pl.'s

Resp. to Defs. Ballard & Jordan's Br. at 6.)  However, there is no evidence that Plaintiff's

protected conduct spurred Defendant Jordan to speak to the media about his feelings toward

Plaintiff; rather, it was Plaintiff himself who created a media firestorm, and whether

Defendant Jordan even responded is disputed.

Moreover, even if Defendant Jordan had taken it upon himself to go to the media with

his negative perception of Plaintiff, Plaintiff has not demonstrated that he was substantially

motivated to do so because of Plaintiff's protected conduct.  Plaintiff's threat to hire an

attorney or sue the Board was made during an executive session of the Board, outside of

Defendant Jordan's presence.  In addition, even if Jordan later became aware of Plaintiff's

threat, he would have had no motive to retaliate against Plaintiff, as Defendant Jordan was

not a Board member and so Plaintiff's speech in no way threatened him.  A similar rationale

applies to Plaintiff's threat to take information about the allegedly compromised grand jury

to outside authorities.  Defendant Jordan was not involved in the alleged illegal activities in

the Tulsa office, nor was he a Board member with a duty to investigate Plaintiff's allegations.

Plaintiff's decision to turn over information to outside authorities would not have affected

Defendant Jordan.  Thus, Plaintiff has not pointed to any evidence of retaliatory intent and

summary judgment on Plaintiff's First Amendment claim is appropriate.  See Worrell, 219 F.3d at 1213 ("[I]f the defendant's intent in urging adverse action against the employee is not retaliatory (e.g., if the defendant identifies legitimate problems with employee's qualifications or performance) or if the defendant's conduct did not cause the adverse action, then the defendant may successfully defend the retaliation claim.") (emphasis added).

### 3.  Defendant Balzer

Because Defendant Balzer was not Plaintiff's employer, the three-part Worrell test governs Plaintiff's claim against her.  As with Plaintiff's claims against Defendants Jordan and Ballard, the Court considers only the second and third prongs of Worrell here.  Although Plaintiff attempts to demonstrate that "the Board followed [Defendant Balzer's] lead at every turn" with respect to his suspension and termination, Plaintiff offers little evidence as support for this assertion.  (See Pl.'s Resp. to Def. Balzer's Br., Dkt. No. 188, at 6-7.)  The evidence cited by Plaintiff shows that Defendant Balzer did, for example, offer a legal definition of sexual harassment; however, it does not establish that Defendant Balzer told the Board that what they had heard affirmatively constituted sexual harassment, despite Plaintiff's claims. (Id. at 7 (citing Pl.'s Resp. to Statement of Facts, Ex. 19, at 64-65).)  Similarly, although Plaintiff's evidence shows that Defendant Balzer advised the Board that it had the authority to suspend or discharge Plaintiff under the at-will doctrine, it does not show that she "recommended" his suspension or termination.  (Id. at 7-8 (citing Pl.'s Resp. to Statement of Facts, Exs. 18 and 21).)  As for Plaintiff's claim that Defendant Balzer "deliberately failed

to advise the Board that it could not discharge Plaintiff for having threatened to sue them,"
Plaintiff offers no evidence at all.  (See id. at 7.)

Because Defendant Balzer was serving as the Board's general counsel, she had a duty
to answer the Board's legal questions and explain the alternatives available to the Board with
respect to Plaintiff's employment.  Defendant Balzer did just this.  Contrary to Plaintiff's
bare allegations, Defendant Balzer has testified that she never "recommended" the Board
take any action with respect to Plaintiff's employment. (Defs.' Joint Mot. for Summ. J., Ex.
87, at 44.)  The individual Board members have likewise testified that Defendant Balzer had
no input into the Board's decision to suspend or terminate Plaintiff.  (Defs.' Joint Mot. for
Summ. J. at 30 (citing Exs. 19, 37, 43, 45, 48).)  Thus, Plaintiff has not established that
Defendant Balzer urged any adverse action against him, much less demonstrated a retaliatory
intent, and his claims must fall under the second and third prongs of Worrell.  See Worrell,
219 F.3d at 1213 ("[I]f the defendant's intent in urging adverse action against the employee
is not retaliatory (e.g., if the defendant identifies legitimate problems with employee's
qualifications or performance) or if the defendant's conduct did not cause the adverse action,
then the defendant may successfully defend the retaliation claim.") (emphasis added).

C.  State Law Claims

Plaintiff's remaining causes of actions are based on Oklahoma constitutional and
statutory provisions and Oklahoma caselaw.  Acknowledging that many of the state issues
raised by Plaintiff's claims are "both 'unsettled and dispositive,'" the Court struck this case
from an earlier trial docket with the intention of certifying several questions to the Oklahoma

Supreme Court, including the questions of whether the Oklahoma courts recognize an implied <u>Bivens</u>-style cause of action for violations of the Oklahoma Constitution[9] and what standard governs Oklahoma free speech claims.[10]  <u>See</u> <u>Kan. Judicial Review v. Stout</u>, 519 F.3d 1107, 1119 (10th Cir. 2008) (<u>quoting</u> <u>Anaconda Minerals Co. v. Stoller Chem. Co.</u>, 990 F.2d 1175, 1177 (10th Cir. 1993)).  Given the importance of allowing the Oklahoma courts

---

[9] Unlike Congress, the Oklahoma legislature has not enacted a statutory mechanism to allow injured parties to bring claims for violations of their constitutional rights.  <u>See</u> 42 U.S.C. § 1983; Lance R. Chism, <u>Bivens-Type Actions Under State Constitutions–Will Tennessee Give You A Remedy?</u>, 30 U. Mem. L. Rev. 409, 419-21 (2000) ("Only a few state legislatures have created miniature § 1983s to address violations of their own state constitutions.").  Moreover, although the Supreme Court has recognized that certain rights guaranteed by the <u>federal</u> Constitution directly imply a cause of action for injured plaintiffs, that holding has not been expanded to apply universally to violations of all <u>state</u> constitutional rights as well.  <u>See</u> <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971) (recognizing an implied cause of action for a Fourth Amendment violation); <u>see also</u> <u>Carlson v. Green</u>, 446 U.S. 14, 16-24 (1980) (applying <u>Bivens</u> to the Eighth Amendment's guarantee against cruel and unusual punishment); <u>Davis v. Passman</u>, 442 U.S. 228, 248-49 (1979) (holding plaintiff had a <u>Bivens</u> cause of action under the equal protection component of the Fifth Amendment's Due Process Clause).  Although some other state courts have recognized an implied cause of action for violations of their state constitutions, the Oklahoma Supreme Court has not yet done so and states are far from unanimous in deciding whether and how to allow such claims.  Chism, 30 U. Mem. L. Rev. at 419-21 (2000); <u>see also</u> Helen Gugel, <u>Remaking the Mold:  Pursuing Failure-to-Protect Claims Under State Constitutions Via Analogous Bivens Actions</u>, 110 Colum. L. Rev. 1294, 1322-24 (2010).  For example, this Court's research indicates that thirteen states have endorsed <u>Bivens</u>-style implied causes of actions for state constitutional violations; two have refused to imply a remedy for state constitutional violations, holding that it is the duty of the legislature to create one; and six others have recognized that <u>Bivens</u> might allow civil suits for damages for state constitutional violations, but have refused to grant such relief after finding the <u>Bivens</u> exceptions applicable.  <u>See</u> Chism, 30 U. Mem. L. Rev. at 419-21 (2000); Gugel, 110 Colum. L. Rev. at 1322-24 (2010).  Thus, it is unclear whether Plaintiff can bring his eighteenth cause of action, entitled "constitutional tort-free speech."

[10] Plaintiff argues that a different standard than <u>Garcetti</u>/<u>Pickering</u> governs his state free speech claims.  Given that the Oklahoma Supreme Court has previously recognized that the "Oklahoma state constitution's protection of free speech is more broadly worded than the First Amendment's restriction on governmental interference with speech," it is unclear what standard applies to state free speech claims.  <u>See</u> <u>Brock v. Thompson</u>, 1997 OK 127, ¶ 16 n.33, 948 P.2d 279, 288 n.33.

to decide novel and significant issues of Oklahoma law, exercising supplemental jurisdiction in this case would be inappropriate.  Because the Court has granted summary judgment to the Defendants on Plaintiff's sole federal issue, remand is appropriate.

## IV. CONCLUSION

Accordingly, the Court hereby DISMISSES Plaintiff's second cause of action and GRANTS all three of the Defendants' Motions for Summary Judgment (Dkt. Nos. 153, 156, 157) as to Plaintiff's fourteenth cause of action.  Judgment shall be entered in favor of Defendants Chris Ferguson, Douglas Stewart, Rocky McElvany, C. Michael Ogle, Shanda McKenny, Charles Curtis, Karlis Sloka, Tom Jordan, Cherokee Ballard, and Sandra Balzer in their individual capacities.  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-based claims and REMANDS this case back to state court. The Clerk of the Court shall take the appropriate steps to return this action to the District Court of Oklahoma County.  Defendants' Joint Motion to Certify Questions to the Oklahoma Supreme Court (Dkt. No. 154) is DENIED as moot; Plaintiff's Motion to Hold Witness Randall Terrill in Civil Contempt (Dkt. No. 195) is DENIED without prejudice to its re-submission in state court.

IT IS SO ORDERED this 21st day of December, 2012.

ROBIN J. CAUTHRON
United States District Judge